**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **GONZALEZ ET AL.,** | |
| *Plaintiffs,* | |
| **v.** | Civil No. 25 -1508 (MAJ) |
| **GOR ET AL.,** | |
| *Defendants.* | |

## OPINION AND ORDER

### I.    Introduction

In 2016, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA" or "the Act"). 48 U.S.C. §§ 2101–2241. PROMESA established the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), pursuant to the authority of Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." 48 U.S.C. § 2121(b)(2) (citing U.S. CONST. art. IV, § 3). The Oversight Board is charged with managing the process of restructuring the public debt of Puerto Rico in order "to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121(a).

The Oversight Board "consist[s] of seven members appointed by the President" of the United States. *See* 48 U.S.C. § 2121(e)(1)(A). Under the Act, each appointed member of the Oversight Board serves a term of three (3) years and may serve consecutive terms. 48 U.S.C. § 2121(e)(5)(A)–(D). Members of the Oversight Board serve without pay. 48 U.S.C. § 2121(g). "The President may remove any member of the Oversight Board only for cause." 48 U.S.C. § 2121(e)(5)(A)–(B).

Plaintiffs Arthur J. González, Dr. Andrew G. Biggs, and Dr. Betty A. Rosa ("Plaintiffs") are members of the Oversight Board . (**ECF No. 1 at 2 ¶¶ 3–4**).[1] On August 1, 2025, Trent Morse ("Morse"), the Deputy Director of the Presidential Personnel Office, sent Plaintiff González an email reading: "On behalf of President Donald J. Trump, I am writing to inform you that your position as a Member of the Financial Oversight and Management Board for Puerto Rico is terminated effective immediately. Thank you for your service." (**ECF No. 1-1**). The email did not articulate any "cause" for his termination. *Id*. That same day, Plaintiff Rosa received the same email from Morse. (**ECF No. 1-2**).[2] Approximately two weeks later, on August 13, 2025 – two days after posting a message on "X" thanking his Oversight Board colleagues for their service – Plaintiff Biggs received the same email. (**ECF No. 1-4**). According to the Complaint, these emails constitute the only notice Plaintiffs received *prior* to the start of this case. (**ECF No. 1 at 10 ¶ 45**). Notably, Plaintiffs contend that they were never granted a hearing or any other opportunity to contest the basis of their removals. *Id.*

Plaintiffs filed this lawsuit on September 18, 2025, seeking injunctive, declaratory, and legal relief against defendants Sergio Gor, in his official capacity as Director of the White House Personnel Office; John E. Nixon, in his official capacity as Member of the Oversight Board; Robert F. Mujica, in his official capacity as the Executive Director of the

---

[1]       Plaintiff González and Plaintiff Biggs have each served as a member of the Oversight Board since 2016. (**ECF No. 1 at 2 ¶ 3**). After completing their first terms, each was reappointed by President Donald J. Trump and President Joseph Biden to serve additional terms. *Id.* Plaintiffs González and Biggs are each currently serving a term that is set to expire in 2027. *Id.* Plaintiff Rosa has served as a member of the Oversight Board since 2020. (**ECF No. 1 at 2 ¶ 4**). After completing her first term as a member of the Oversight Board, Plaintiff Rosa was reappointed to serve an additional term by President Joseph Biden. *Id.* Plaintiff Rosa is currently serving a term that is set to expire in 2027. *Id.*

[2]       On or around the same date, the President also removed three other Oversight Board Members: Cameron McKenzie, Juan Sabater, and Luis Ubiñas. *See* Dánica Coto, *3 members of federal control board in Puerto Rico sue Trump and others for illegal firings*, AP NEWS (Sept. 18, 2025), https://apnews.com/article/puerto-rico-fomb-board-lawsuit-trump-dismissal-1beb1f1bf041f438a73fb791a122dc11 [https://perma.cc/388G-KFC6] (last visited Oct. 1, 2025).

Oversight Board; and Donald J. Trump, in his official capacity as President of the United States. (**ECF No. 1**). On September 22, 2025, Plaintiffs filed a Motion for Preliminary Injunction. (**ECF No. 8**). Plaintiffs argue that emergency relief is necessary to "preserve the status quo ante" because they suspect that the President may attempt "unlawfully to replace [them] on the Oversight Board while they challenge their purported removals." (**ECF No. 24 at 4**).

On September 25, 2025, the Court issued an order scheduling a hearing to adjudicate the request for emergency injunctive relief. (**ECF No. 29**). Shortly thereafter, on the evening of Friday, September 26, 2025, Plaintiffs each received a letter from Morgan DeWitt, Deputy Director of Presidential Personnel. (**ECF No. 57**). The letters purport to establish "cause" by alleging that Plaintiffs conduct on the Oversight Board was characterized by "inefficiency, ineffectiveness, neglect, and failure to advance the statutory mission of the Oversight Board." *See, e.g.*, (**ECF No. 57-1 at 2**).

On September 29, 2025, the Court held a hearing to adjudicate the request for emergency injunctive relief. (**ECF Nos. 80, 84**).[3] At the hearing, counsel for Defendants John E. Nixon and Robert F. Mujica informed that they did not oppose the request for preliminary injunctive relief. After careful consideration of the issues presented, the Court **GRANTS** Plaintiffs' request.

---

[3] The Court originally set the hearing to address whether the issuance of a Temporary Restraining Order was warranted. (**ECF No. 29**). Before the hearing, however, all Defendants had appeared in the case. In addition, prior to the hearing, Defendants Sergio Gor and Donald J. Trump filed a response to Plaintiff's motion for a preliminary injunction. (**ECF No. 59**). As a result, the Court converted the hearing to a hearing on Plaintiff's request for a preliminary injunction. The parties expressly stated that they did not object to that decision. (**ECF No. 80 at 3:18–4:3**).

## II.    Analysis

"A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right. Its purpose is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (internal quotations and citations omitted). When evaluating a request for a preliminary injunction, courts must consider the following factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)). Where, as here, the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court will address each factor in turn.

### A.    Likelihood of Success on the Merits

#### i.    The attempted removals do not satisfy the "for cause" requirement of PROMESA.

Under PROMESA, the President has the authority to remove members from the Oversight Board. 48 U.S.C. § 2121(e)(5)(B). Crucially, however, the President may only remove a board member "for cause." *Id*.

As previously noted, the only notice received by Plaintiffs before the attempted removals was the following message:

> On behalf of President Donald J. Trump, I am writing to inform you that your position as a Member of the Financial Oversight and Management Board for Puerto Rico is terminated effective immediately. Thank you for your service.

(**ECF No. 1-1, 1-2, 1-4**). Prior to the filing of this lawsuit, no additional formal communications were made to Plaintiffs about the supposed basis for the attempted removals. At most, according to Defendants, days after the President attempted to remove Plaintiffs González and Rosa from office, an unnamed "White House official explained [to Breitbart News] that the Board had been 'run inefficiently and ineffectively by its governing members for far too long[.]'" (**ECF No. 59 at 5**). Subsequently, on September 26, after the lawsuit and instant motion for a preliminary injunction had already been filed, Plaintiffs each received a letter on from Morgan DeWitt, Deputy Director of Presidential Personnel. (**ECF No. 57-1–57-3**). The letters purport to establish "cause" by alleging that Plaintiffs conduct on the Oversight Board was characterized by "inefficiency, ineffectiveness, neglect, and failure to advance the statutory mission of the Oversight Board." *See, e.g.*, (**ECF No. 57-1 at 2**).

Defendants offer several theories as to why these events satisfied the "for cause" provision of Section 2121(e)(5)(B). First, Defendants argue that, despite the clear statutory limitation on the President's removal power under the Act, PROMESA does not require the President to provide notice or explanation of the purported "cause" for termination in order to remove a member of the Oversight Board. (**ECF No. 59 at 8**). In other words, Defendants urge the Court to hold (1) that the "for cause" provision of Section 2121(e)(5)(B) empowers the President to identify any "cause" for removal that he considers adequate; (2) that the statute does not require him to disclose that cause; and (3) that he need not provide the government official subject to removal with an opportunity to contest the grounds for their termination. *Id*. at 7–8. Second, Defendants argue that, that to the extent the President *was* required to provide notice of his reasons for removing Plaintiffs from office, post-hoc statements made by the President and his

subordinates have satisfied that requirement. (**ECF No. 59 at 5–6**). Lastly, Defendants try to convince the Court that even if the President did violate the law, it simply would not matter: according to Defendants, judicial review of Section 2121(e)(5)(B) removals is not available. (**ECF No. 59 at 9**).[4]

These issues present a question of statutory interpretation: by vesting the President with the power to remove a member of the Oversight Board "for cause", did Congress impose any discernible limits on the President's power to remove members from the Oversight Board?[5] For the following reasons, the Court concludes that PROMESA does impose discernible limits on the President's removal power, that the purported "cause" provided by the President did not satisfy that standard, and that this controversy is subject to judicial review.

### a. The "for cause" provision of 48 U.S.C. § 2121(e)(5)(B) creates a statutory right to pre-termination notice and opportunity for a hearing.

The Supreme Court has indicated that where Congress provides that a federal officer may be removed only for cause, "the officer is entitled to notice and a hearing." *Shurtleff v. United States*, 189 U.S. 311, 314 (1903) (citing *Reagan v. United States*, 182 U.S. 419, 425 (1901); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 536–537 (2010) (J. Breyer, dissenting) ("*all* officers protected by a for-cause removal

---

[4]    Defendants also argue that, even if judicial review were available, the Court generally lacks the equitable powers to enjoin the President. The Court will address that argument below.

[5]    The U.S. Constitution does not vest the President with any additional power to remove members of the Oversight Board, beyond the power vested in the President by the statutory "for cause" removal power of Section 2121(e)(5)(B). That is because the Supreme Court has held that members of the Oversight Board are not "Officers of the United States." *Fin. Oversight & Mgmt. Bd. for P. R. v. Aurelius Inv., LLC*, 590 U.S. 448, 465 (2020). As such, the Appointments Clause contained in Article II of the Constitution does not extend to members of the Oversight Board. *Id.* Since "removal is incident to the power of appointment[,]" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010), the President's only power to remove members of the Oversight Board is the statutory power to remove them "for cause" as provided by Section 2121(e)(5)(B). Defendants do not claim otherwise.

provision and later subject to termination are entitled to notice and [a] hearing . . . as without such review the appointing power otherwise could remove at pleasure or for such cause as [only] it deemed sufficient.") (quoting *Reagan*, 182 U.S. at 425) (internal quotations omitted).[6] This is because where a statute provides that an official may be removed only "for cause," that suggests that Congress intended to place the decision to remove that official beyond the unlimited discretion of one actor. *See Collins v. Yellen*, 594 U.S. 220, 256 (2021) (noting that "for cause . . . does not mean the same thing as at will") (internal quotations omitted). Without an entitlement to notice and a hearing, even a government official with nominal "for cause" protections would remain – for all practical purposes – subject to the unchecked discretion of the removing authority.

Defendants argue that the term "for cause" actually means its opposite; according to Defendants, because the statutory term "for cause" is not defined by PROMESA, the term must be read as "explicitly giv[ing] the President discretion to remove Board members if he determines that cause exists," such that the decision to remove "is a matter of discretion and not reviewable." (**ECF No. 59 at 8**) (internal citations and quotations omitted). In other words, Defendants essentially argue that the statutory term "for cause" should be read to mean "at will." The Court disagrees. There is no question that where Congress creates a "for cause" removal provision, the provision functions to some degree as a "restriction" on the "removal authority" of the President. *See Collins*, 594 U.S. at 255.

---

[6]      In *Free Enterprise Fund*, the Supreme Court addressed an Appointments Clause challenge to a pair of "for cause" removal provisions under the Sarbanes-Oxley Act. 561 U.S. 477. Since the Appointments Clause does not apply to Presidential appointments under PROMESA, *see supra* n.6, *Free Enterprise Fund* is not directly applicable to the facts of this case. Additionally, since the "for cause" removal provisions at issue in *Free Enterprise Fund* expressly provided for "judicial review of any effort to remove Board members," *id.* at 502, that case did not address whether a "for cause" cause removal provision necessarily triggers a right to notice and a hearing.

That is true even where Congress has "give[n] the President more removal authority" by neglecting to define what constitutes "cause" under the statute. *Id*.[7]

Next, Defendants argue that to interpret Section 2121(e)(5)(B) as requiring "notice and a hearing" would require the Court to read "words or elements into a statute that do not appear on its face." (**ECF No. 59 at 10**) (internal citations and quotations omitted). For support, Defendants cite to *Kennedy v. Braidwood Mgmt., Inc.*, where the Supreme Court cautioned against "read[ing] a for-cause removal restriction into a statute that does not explicitly provide for one." 145 S. Ct. 2427, 2448. Yet *Braidwood* is not at all analogous to the facts of this case: in *Braidwood*, the statute in question included no explicit "for cause" language, and instead merely provided that the members of the administrative agency in question were "independent." *Id*. at 2449 ("The word 'independent' alone in a statute does not make an officer removable only for cause."). In contrast, Section 2121(e)(5)(B) explicitly provides that "[t]he President may remove any member of the Oversight Board only *for cause*." 48 U.S.C. 2121(e)(5)(B) (emphasis added). Moreover, the Supreme Court has previously stated that a "for cause" removal provision creates a statutory right to notice and a hearing, even where the statute in

---

[7]        Defendants argue that there is no right to notice and a hearing where a statute provides "for cause" removal protections without defining "cause." For support, Defendants rely on *Reagan v. United States*, 182 U.S. 419 (1901). (**ECF No. 59 at 8**). That case is distinguishable. In *Reagan*, the governing statute authorized removal of certain federal officers for "causes prescribed by law," but did not further define the "causes" that would qualify under that provision. *Reagan*, 182 U.S. at 424–25. Accordingly, as a matter of statutory interpretation, the Supreme Court held that the decision to remove was not reviewable. *Id*. Defendants reliance on *Reagan* is misplaced for three principal reasons. First, the holding in *Reagan* was based on statutory language ("prescribed by law") not present in this case. Defendants are therefore mistaken when they state that the decision is "binding" in this case. Second, Plaintiffs were appointed for a term of three (3) years, whereas the commissioner in Reagan did not "hold their office[] . . . by any fixed tenure[.]" *Id*. at 424. Third, the argument is foreclosed by *Collins*, which recognized that the statutory term "for cause" does work a "restriction" on the removal authority of the President even where the statute does not expressly state what constitutes "cause." *Collins*, 594 U.S. at 255.

question did not explicitly provide for "notice and a hearing." *Shurtleff*, 189 U.S. at 313–314.

This interpretation of Section 2121(e)(5)(B) is consistent with the broader legislative backdrop of the Act: as the Supreme Court has held, that members of the Oversight Board do not constitute "Officers of the United States." *Aurelius Inv., LLC*, 590 U.S. at 465. Instead, when Congress created the Oversight Board, it created an institution with "primarily local powers and duties." *Id*. Thus the purpose of the Board is not to accomplish the policy objectives of the Executive Branch. *Id*. ("Congress did not intend to make the Board members 'Officers of the United States'"). A statutory provision ensuring that the President may remove "primarily local" officials only "for cause" is entirely consistent with that broader legislative design.[8]

The Court therefore finds that the "for cause" provision of 48 U.S.C. § 2121(e)(5)(B) creates a statutory right to pre-termination notice and opportunity for a hearing. *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (""It is a commonplace [principle] of statutory interpretation that Congress legislates against the backdrop of existing law.") (internal quotations and citations omitted).

### b. Plaintiffs are likely to succeed on the merits establishing that the President's actions violated the "for cause" standard of the statute.

Since Plaintiffs were entitled to notice and a hearing before facing removal from office, the President's actions likely violated the "for cause" standard of Section 2121(e)(5)(B). That is because the President never articulated any "cause" before

---

[8]     While *Aurelius Investments* resolved a constitutional claim not presented in this case, it is worth echoing the Court's reasoning that, to assume without statutory support that the President exercises broad and unfettered powers in this context could "work havoc" on "primarily local" institutions. 590 U.S. at 464.

attempting to remove Plaintiffs from office. Nor were Plaintiffs afforded an opportunity for a hearing. Instead, as previously explained, the only communication Plaintiffs received when the President attempted to remove them from office was the following:

> On behalf of President Donald J. Trump, I am writing to inform you that your position as a Member of the Financial Oversight and Management Board for Puerto Rico is terminated effective immediately. Thank you for your service.

(**ECF No. 1-1, 1-2, 1-4**). Rather than articulate a cause for the decision to remove Plaintiffs from office, the Administration instead attempted to bypass the limitations on the President's authority explicitly provided under Section 2121(e)(5)(B). Here, as in *Shurtleff*, "[i]t must be presumed that the President did not make the removal for any cause assigned in the statute, because there was given to the officer no notice or opportunity to defend." 189 U.S. at 314.

Defendants do not claim that they provided any notice of the purported "cause" *before* attempting to remove Plaintiffs from office. Nor do they argue that Plaintiffs had any opportunity to defend against the attempted removals. Instead, Defendants argue that post-hoc statements made by Administration officials effectively cured their failure to satisfy the "for cause" standard of Section 2121 (e)(5)(B). Again, the Court disagrees.

First, according to Defendants, days after the President attempted to remove Plaintiffs González and Rosa from office, an unnamed "White House official explained [to Breitbart News] that the Board had been 'run inefficiently and ineffectively by its governing members for far too long[.]'" (**ECF No. 59 at 5**). For one, Defendants do not explain how these belated statements satisfied the notice and hearing requirement of *Shurtleff*. Further, Defendants fail to provide any legal support for the tenuous proposition that informal public statements made by an unnamed "administrative

official" may constitute the kind of formal notice required by Section 2121(e)(5)(B).[9] There are good reasons to believe that such statements – even if they had been timely – would not constitute proper notice. As the Court explains in further detail below, *infra* Section II.A.ii, the right to notice and a hearing arises from basic due process principles. *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The essential requirements of due process . . . are notice and an opportunity to respond.").

The central point in this line of cases is that the Government may not take a protected interest away from a person without first informing that person of the allegations against them, such that they have a genuine opportunity to challenge the deprivation. *See id.* (the purpose of the notice requirement in public employment termination cases is to provide the employee "notice of the charges against them" and an "explanation of the employer's evidence"). Since "[t]he purpose of such notice and hearing is to provide the person an opportunity to clear his name[,]" notice must be reasonably calculated to inform the official subject to removal of the actual charges against them. *Codd v. Velger*, 429 U.S. 624, 627 (1977) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 n.12 (1972)). In this case, Defendants never attempted to serve Plaintiffs with formal notice. *Cf. Schroeder v. New York*, 371 U.S. 208, 211 (1962) ("newspaper publications and posted notices . . . did not measure up to the quality of notice" required by the Due Process Clause, where no additional good faith effort was made). In addition, the informal "notice" was blatantly defective. It is just not reasonable to suggest that a generalized charge of "inefficiency" and "ineffectiveness," made

---

[9]    At the hearing, when asked whether Defendants had any legal support for the proposition that public statements by unnamed administration officials could suffice to establish the requisite "notice," counsel for the Defendants responded, "I don't know." (**ECF 80 at 21:14–23**).

informally to a news outlet by an unnamed official, provided Plaintiffs with adequate notice. Even assuming that Plaintiffs did learn that these anonymized allegations were circulating in the news, they could not have been faulted for having wondered whether, for instance, that was actually the official position of the Administration; whether that position might change the next time an unnamed "White House official" spoke to the press; or what exactly the alleged Administration official meant by its charges of "inefficiency" and "ineffectiveness." *See Cook v. Trump*, Civ. No. 25-2903, 2025 U.S. Dist. LEXIS 175756, at *53 (D.D.C. Sept. 9, 2025) (hereinafter, "*Cook* (D.D.C. opinion)") (rejecting the argument that "a scattered assortment of social media posts and news articles" constituted proper notice before attempted removal of government official); *see generally Trump v. Hawaii*, 585 U.S. 667 (2018).

Second, Defendants point to the letters sent to Plaintiffs six weeks after the attempted removals, on September 26, 2025 – after a hearing for the instant motion was already scheduled – which purported to establish "cause" for the removals by alleging that Plaintiffs' conduct on the Oversight Board was characterized by "inefficiency, ineffectiveness, neglect, and failure to advance the statutory mission of the Oversight Board." *See, e.g.*, (**ECF No. 57-1 at 2**). The Court declines to address whether those letters would have constituted proper notice had they been timely. As the Court addresses in further detail below, *see infra* Section II.A.ii.b, it is ordinarily crucial that notice and an opportunity for a hearing be provided *before* any attempted removal, except under limited circumstances. *See F.D.I.C. v. Mallen*, 486 U.S. 230, 240 (1988) ("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, *may in limited cases demanding prompt action* justify postponing the opportunity to be heard until after the initial deprivation.") (emphasis

added); *Gilbert v. Homar*, 520 U.S. 924, 930, 933 (1997) (providing that a post-deprivation process may satisfy due process where a pre-deprivation hearing would be "impractical" or "worthless"). Defendants offer no argument as to why a pre-termination process would have been impractical in this case, nor why a post-termination process would have sufficed.

Moreover, even if the Court were to assume that the September 26 letters constitute proper notice, Defendants' argument would still fail because they never afforded Plaintiffs a hearing at all, either before or after the attempted removals. Thus, the Court finds that the letters sent by Defendants on September 26, 2025 are fundamentally defective. If anything, those letters appear to acknowledge that Defendants were required all along to provide some notice of the "cause" for the attempted removals.

Accordingly, the Court finds that the President's actions likely violated the "for cause" standard of Section 2121(e)(5)(B).

### c.    There is judicial review of "for cause" terminations under the Act.

Defendants argue that the President's apparently arbitrary decision to remove Plaintiffs without cause is not subject to judicial review. (**ECF No. 59 at 7–8**). The Court disagrees. The Court has jurisdiction over the instant case and may rule on the "discernible limits on the President's discretion":

> It is true that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available. But where the authorizing statute . . . places discernible limits on the President's discretion, review is available, given that the responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts.

*Cook* (D.D.C. opinion), 2025 U.S. Dist. LEXIS 175756, at *34–35 (internal quotations and citations omitted). In fact, in that case, the Government conceded at oral argument that

the "case *would be reviewable* had President Trump provided Cook with no cause whatsoever." *Id.* at *35 (emphasis added). To hold otherwise – that there is no "judicial review" of removals under PROMESA – would render the "for cause" provision of Section 2121(e)(5)(B) a nullity and would convert the "for cause" requirement into one of "at will." That was not Congress' intent. Absent judicial review, the President could for all practical purposes exercise the statutory removal power of Section 2121(e)(5)(B) for any reason or no reason at all. Put another way, the statutory term "for cause" demonstrates that Congress intended to provide for judicial review.[10] This appears to be a fairly uncontroversial premise: Judge Katsas, who advocated in dissent for staying the District Court's preliminary injunction in *Cook*, took for granted that where a government official facing discharge "could demand a constitutional entitlement to adjudicatory process prior to her removal, she also could enlist the judiciary to review the adequacy of that process." *See, e.g., Cook v. Trump*, Civ. No. 25-5326, 2025 U.S. App. LEXIS 23816 (D.C. Cir 2025) (Katsas, J., dissenting). Indeed, it is not clear why the Supreme Court would hold in a closely analogous context that a "for cause" removal provision violates the separation of powers, if removals were never subject to judicial review. *Collins*, 594 U.S. at 256.

In arguing otherwise, Defendants appear to confuse "review for the sufficiency and adequacy of a permissible cause . . . with whether the President has even provided a legally permissible cause in the first place[.]" *See Cook* (D.D.C. opinion), 2025 U.S. Dist. LEXIS 175756, at *36 (finding that the latter is "clearly reviewable."). Under the plain terms of

---

[10]      To support their contention that removals under Section 2121(e)(5)(B) are not subject to review, Defendants rely on *Reagan v. United States*, 182 U.S. 419 (1901). For the same reasons provided above, *supra* n.7, the conclusion in *Reagan* that Presidential removals are "not reviewable" is not applicable in this case.

PROMESA, which permit the President to remove a member from the Oversight board "only for cause," the latter question is subject to judicial review.

### ii.    Plaintiffs are likely to prevail on the merits of their constitutional due process claims.

The Fifth Amendment's Due Process Clause guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. In determining whether an individual's procedural due process rights have been violated, federal courts conduct a two-step inquiry. First, the Court must determine whether the Plaintiffs have "a life, liberty, or property right" affected by the challenged government conduct. *Kerry v. Din*, 576 U.S. 86, 90 (2015) ("Although the amount and quality of process that our precedents have recognized as 'due' under the Clause has changed considerably since the founding, it remains the case that *no* process is due if one is not deprived of 'life, liberty, or property[.]'"). Next, the Court weighs "the governmental and private interests that are affected" to determine whether "the procedures provided . . . are constitutionally sufficient[.]" *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976) (identifying three relevant factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."); *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property").

### a. Plaintiffs have a property interest in their positions as members of the Oversight Board.

Plaintiffs have a protected property interest in their positions as members of the Oversight Board. In *Cleveland Board of Education v. Loudermill*, the Supreme Court held that, under the Fourteenth Amendment, "a public employee who can be discharged only for cause" has a constitutionally protected property interest in their continued employment. 470 U.S. 532, 535, 538–39 (1985). This rule is well-established. *See, e.g., Gilbert*, 520 U.S. at 928–29 (affirming that "public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process" and assuming, without deciding, that the same rule extends "to discipline of tenured employees short of termination").

Plaintiffs were public employees appointed for a term of three (3) years who by law could be discharged "only for cause." 48 U.S.C. § 2121(e)(5)(A)–(B). Nevertheless, Defendants argue that *Loudermill* does not extend to officers of the federal government. (**ECF No. 59 at 10**) ("[*In Loudermill*], the Supreme Court held that public employees had 'a property right in continued employment' because state law granted them such a property right."). While it is true that in *Loudermill*, the protected "property right" to continued employment was granted by a state rather than a federal statute, *Loudermill*, 470 U.S. at 538–39, Defendants never explain why that ought to make any difference. As the Supreme Court has cautioned, "[i]t would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government" under the Fifth Amendment than it imposes on the states under the Fourteenth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954); *see also LaChance v. Erickson*, 522 U.S. 262, 266 (1998) (assuming that "the right to notice and a meaningful opportunity to be heard" under *Loudermill* extends

to the Fifth Amendment where a federal employee has a "protected property interest in their employment"); *Stone v. F.D.I.C.*, 179 F.3d 1368, 1375 (Fed. Cir. 1999) (extending *Loudermill* to a federal employee who could not be dismissed except "for cause or unacceptable performance"); *See Cook* (D.D.C. opinion), 2025 U.S. Dist. LEXIS 175756, at *43 (extending the holding of *Loudermill* to a Fifth Amendment due process claim). . The Court therefore finds that *Loudermill* extends to the Fifth Amendment context, such that a federal official who, pursuant to federal statute can be discharged only for cause, has a constitutionally protected property interest in their position.

Next, Defendants broadly proclaim that "public office is not property," but again fail to provide genuine support for their position. (**ECF No. 59 at 9–10**) (quoting *Taylor v. Beckham*, 178 U.S. 548, 576 (1900); *Crenshaw v. United States*, 134 U.S. 99, 104 (1890)). Defendants recently relied on the same arguments in *Cook v. Trump*, Civ. No. 25-5326, 2025 U.S. App LEXIS 23816 (D.C. Cir. Sept. 15, 2025) (hereinafter, "*Cook* (D.C. Cir. Opinion"). There, as here, the arguments were not persuasive. *Id*. at *6 (Garcia, J., and Childs, J., concurring) ("With the principles underlying modern due process precedent stacked against it, the government turns to broad language in inapposite cases."). As the concurring judges explained, "[t]he government overreads *Taylor*[,]" a case in which, after the Kentucky general assembly resolved a contested gubernatorial election under state constitutional law, "[t]he losing candidates – who had been temporarily installed in office after the election – argued that the legislature's action deprived them of their property without due process of law." *Id*. at *6 (internal quotations omitted). The *Taylor* case "involved nothing akin to a statutory for-cause removal protection: The only argument for a property interest was that the offices in question were 'both profitable and honorable.'" *Id*. at *7 (quoting *Taylor*, 178 U.S. at 557). This Court

agrees: *Taylor* is inapposite and does not control the issues presented by this case. The same is true of *Crenshaw*, a case in which the Supreme Court adopted "the uncontroversial – and inapplicable – proposition that Congress could amend [a statute] to remove . . . for-cause protection [for a federal official] without running afoul of the Due Process Clause*." Cook* (D.C. Cir. Opinion), 2025 U.S. App LEXIS 23816, at *8.

Defendants also point out that Plaintiffs were not paid as members of the Oversight Board, arguing that Plaintiffs therefore may not claim a protectible property interest in their appointed positions. (**ECF No. 59 at 9**). The Court is not persuaded. Defendants provide no support for the proposition that the applicability of *Loudermill* and its progeny depends on the profitability of the government position in question. Prior cases explain that "property interests" are not defined so narrowly. *Bd. of Regents of State Colleges*, 408 U.S. at 571–72 ("The Court has . . . made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money.") (collecting cases); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("'[P]roperty denotes a broad range of interests that are secured by 'existing rules or understandings'"). Moreover, caselaw suggests that the basis of any property interest in a government post turns on the extent of any substantive limitations on the government's authority to remove the employee from their position, not strictly on the monetary benefits conferred by the position. *See Bishop v. Wood,* 426 U.S. 341, 345 (1976) (whether a property interest in public employment exists depends on whether the governing law "has actually granted some form of guarantee" to the employee) (citation omitted); *Cook* (D.D.C. opinion), 2025 U.S. Dist. LEXIS 175756, at *44 ("the basis of the property interest in a government employee's position turns on the extent of any substantive limitations on the government's authority to remove her") (quoting *Esparraguera v. Dep't of the Army*, 101

F.4th 28, 33 (D.C. Cir. 2024); *Laureano-Agosto v. Garcia-Caraballo*, 731 F.2d 101, 103 (1st Cir. 1984) (a protectible property interest exists where an employee does "not serve in [their] job at [their] employer's 'will,' but . . . could be removed only 'for cause.'").[11]

PROMESA makes expressly clear that Plaintiffs may only be removed "for cause." 48 U.S.C. § 2121(e)(5)(B). Because prior case law holds that a government employee who may only be removed for cause has a protectible property interest in their employment, Plaintiffs are likely to succeed on the merits on this issue. *Laureano-Agosto*, 731 F.2d at 103.

### b. Plaintiffs are likely to succeed on the merits establishing that they did not receive sufficient process prior to removal.

Having determined that Plaintiffs were deprived of a protected interest, the Court turns to the second part of the due process inquiry: whether Plaintiffs were afforded "the minimal procedural protections of notice and an opportunity to respond." *Whalen v. Mass. Trial Court*, 397 F.3d 19, 26 (1st Cir. 2005). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (citation omitted). Nevertheless, while these requirements are "flexible", the Government must observe at least minimal procedural guardrails guaranteed by the Fifth Amendment. As noted above, the Supreme Court has "described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally

---

[11]     The Court notes that recent Supreme Court precedent has adopted a conception of property rights protectible under the due process clause that is arguably even broader than what was understood to be protected under the clause at the time *Loudermill* was published. *See, e.g., Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) (holding that employers had protectible property interest in excluding union organizers from their land).

protected property interest in his employment." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). In short, "[t]he essential requirements of due process . . . are notice and an opportunity to respond." *Id.* at 546.

As the Court has already explained, Plaintiffs were afforded no process at all. The August termination emails they received did not constitute fair "notice" because those emails did not even attempt to articulate a basis for the firings. In addition, Plaintiffs were never afforded a hearing or any other opportunity to contest the (unstated) allegations made against them. The Government does not contest that fact. (**ECF No. 59**).

Moreover, there is nothing on the record that reasonably suggests that this is one of those unique cases where "it would [have been] impractical to provide pre-deprivation process," such that a "post-deprivation process" could instead satisfy "the requirements of the Due Process Clause." *Id.* at 930-931 (quoting *F.D.I.C. v. Mallen*, 486 U.S. 230, 240 (1988) ("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, *may in limited cases demanding prompt action* justify postponing the opportunity to be heard until after the initial deprivation.") (emphasis added)). Nor has the Government made that argument. In certain limited cases, post-deprivation process may be constitutionally permissible where, for instance, there is (1) "substantial assurance that the deprivation is not baseless or unwarranted" and where circumstances demand "prompt action" from the government, *Mallen*, 486 U.S. at 240, (2) the government provides an *immediate* post-deprivation hearing in lieu of a pre-deprivation hearing, *Mitchell v. W.T. Grant Co.*, 416 U.S. 600 (1974), or (3) "the potential length or severity of the deprivation does not indicate a likelihood of serious

loss", *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978).[12] These cases are the exception, not the rule. Here, Defendants provide no sound reason to believe that this case is one where a pre-deprivation process was impractical, or that this case is one in which a post-deprivation process would have sufficed. Almost two months have passed since the President attempted to remove Plaintiffs from office, and Plaintiffs have not been replaced by new appointments in that time. As such, there is no apparent reason why during that time it should have been "impractical" for the Defendants to observe minimal procedural requirements before attempting to remove Plaintiffs from office.

More importantly, setting aside whether a pre-termination process would have been required, Defendants never presented Plaintiffs any opportunity for a hearing – before or after the attempted removals. If they had, the "flexible" requirements of due process would have permitted that hearing to take a variety of forms.

Historically, former Presidents have managed to exercise the removal power efficiently even while observing these minimal procedural requirements. In 1913, for instance, President Taft removed two "for cause" protected officials "following an extensive inquiry by an investigative committee which involved fact-gathering, public hearings, and consideration of the members' rebuttals." *See, e.g., Cook* (D.D.C. Opinion), 2025 U.S. Dist. LEXIS 175756, at *57–58. Decades later, in another example, when President Ford considered removing a "for cause" protected official from office, "the Executive Branch requested that the board member participate in an 'evidence-gathering inquiry' presided over by the office of the White House Counsel." *Id*. These examples are

---

[12]    Other examples include situations where pre-deprivation procedures "would not address the risk of [the particular] kind of deprivation" at issue in the case, *Zinermon v. Burch*, 494 U.S. 113, 129 (1990), or where a public emergency requires immediate action and outweighs the risk of erroneous destruction of property, such as where the government was permitted to seize and destroy "unwholesome" food without a pre-seizure hearing, *North American Cold Storage v. Chicago*, 211 U.S. 306 (1908).

merely illustrative: the specific process afforded to a removed official may differ from one case to the next.[13] What is necessary is that such processes grant "the removed officer a significant opportunity to confront the evidence against them and make their case." *Id*. at *58. Nothing more. Here, Plaintiffs were denied that opportunity. Indeed, they were afforded no opportunity for a hearing at all.

The Court therefore finds that Plaintiffs likely were not afforded the minimal requisite procedural protections of notice and an opportunity to respond before the attempted removals.

### B.    Irreparable Harm

Irreparable harm consists of a substantial injury that is not accurately measurable or adequately compensable by money damages. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000). The party moving for a preliminary injunction bears the "burden of demonstrating that a denial of interim injunctive relief would cause irreparable harm." *Ross-Simons of Warwick*, 102 F.3d at 18. In considering "the irreparability of alleged harm and . . . the propriety of injunctive relief[,]" a district court exercises "broad discretion." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).

Plaintiffs argue that the challenged removals "deprive [Plaintiffs] of their roles as presidentially appointed members of the [Oversight Board] and mean they cannot perform their statutory duties as members of the [Oversight Board] as required by law." (**ECF No. 8 at 17**). Plaintiffs stress that they are "charged with significant responsibilities

---

[13]    The President of course may delegate this process to an agent and need not participate in the hearing in a personal capacity. What is required by both PROMESA and the Fifth Amendment is simply that the notice and hearing afforded to the Board Member administer due process.

overseeing billions of dollars in debt restructuring on behalf of the Commonwealth of Puerto Rico." (**ECF No. 8 at 18**). They also argue that, if they are swiftly replaced by other appointments, it is possible that no court will in the future be able to restore them to their positions, no matter the legality of the attempted removals. (**ECF No. 24 at 4**). Plaintiffs also point to numerous recent decisions where district courts have uniformly concluded in removal cases that, if an official is wrongfully deprived of their statutory right to function as a public employee, irreparable harm is established per se. (**ECF No. 8 at 17**) (collecting cases).[14] In opposition, Defendants attack the idea that being removed from the Oversight Board constitutes "irreparable harm" to Plaintiffs. (**ECF No. 59 at 15−16**). In addition, Defendants argue that "Plaintiffs' claim of irreparable harm is also contradicted by their delay in filing suit and the fact [that] they are uncompensated." (**ECF No. 59 at 16**).

The Court finds that being prevented from discharging their duties as members of the Oversight Board itself constitutes an irreparable harm to Plaintiffs that would not be adequately compensable by money damages. The seven members of the Financial Oversight and Management Board occupy unique tenured positions in which they are responsible for restructuring billions of dollars in debt "with the aim of mitigating the . . . severe economic decline" of Puerto Rico. *Aurelius Inv., LLC*, 590 U.S. at 487 (2020) (Sotomayor, J., concurring). "The Board's decisions have affected the island's entire

---

[14]     The Court notes that the preliminary injunctions issued in some of those cases have been stayed on appeal. *See, e.g., Trump v. Wilcox*, 145 S. Ct. 1415, 1416-1417 (2025) ("The stay also reflects our judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty."). However, in this case Plaintiffs never exercised "the executive power" because they were not "Officers of the United States." *See Aurelius Inv., LLC*, 590 U.S. at 465. The Supreme Court's decision to stay the preliminary injunction issued by the District Court in *Wilcox* is therefore not applicable to the facts of this case.

population, particularly many of its most vulnerable citizens." *Id*. These unique and far-reaching statutory powers cannot be replaced by money damages.

Moreover, the totality of the circumstances weighs in favor of issuing preliminary injunctive relief to prevent this irreparable harm to Plaintiffs. In this case, there is a real and imminent threat that, without immediate redress, the harms that Plaintiffs face will soon be irremediable. *See Together Employees v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021) ("A preliminary injunction preserves the court's ability to grant final relief."); *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) ("A preliminary injunction should not issue except to prevent a real threat of harm. A threat that is either unlikely to materialize or purely theoretical will not do."). In reaching this conclusion, two factors stand out.

First, the Court takes notice of Defendants attempt to change the facts on the ground during the pendency of this litigation. As previously noted, on the evening of Friday, September 26, 2025, Plaintiffs each received a letter from Defendants purporting to establish cause for the attempted removals post-hoc. (**ECF No. 57-1-3**). The letters were sent after this case was filed, after Plaintiffs requested injunctive relief, and after this Court scheduled a hearing to resolve that motion. *Id*. This suggests that Defendants are taking – and, provided an opportunity, will likely continue to take – steps to unliterally change the status quo and prevent the possibility of meaningful review of the President's apparently unlawful acts. Absent immediate injunctive relief, there is an imminent and "real threat of harm" because Defendants may, as Plaintiffs warn, (**ECF No. 24 at 6**), attempt to appoint new members to the Oversight Board. *Matos*, 367 F.3d at 73.

Second, a preliminary injunction is necessary under such circumstances to preserve the court's ability to grant final relief because the harms Plaintiffs face may not be remediable once they have been replaced by new members on the Oversight Board. Defendants argue at length that the Court's equitable powers are limited where it conducts review of potentially unlawful acts committed by the President. (**ECF No. 59 at 12–13**). As a broad proposition of law, that is accurate. *See, e.g., Mississippi v. Johnson*, 71 U.S. 475 (1867). For that very reason, however, if the President were to replace Plaintiffs with new members on the Oversight Board, it is not clear that the Court would still be able to redress the harms they face. Thus, a preliminary injunction is necessary to preserve "the court's ability to grant final relief" in this case. *Together Employees*, 19 F.4th at 7.

Defendants contend that "Plaintiffs cannot make the required showing of irreparable harm . . . [because] [u]nlike [in] other litigation challenging removals by the President, Plaintiffs delayed for *weeks* in bringing suit." (**ECF No. 59 at 3**). Plaintiffs counter that they waited approximately six weeks to file this lawsuit because "Plaintiffs' roles as members on the Oversight Board, which has engaged in extensive restructuring litigation involving multiple entities and attorneys, meant that securing conflict-free counsel took longer than it might for other litigants." (**ECF No. 24 at 3**). While delay in filing a petition for injunctive relief may undermine a plaintiff's claim of irreparable harm, the delay in this case was not so long as to shift the balance. *See, e.g., Charlesbank Equity Fund*, 370 F.3d at 163 (stressing that the plaintiff had waited "more than a year . . . to seek an injunction" and stating "[t]he longer the delay, the more pervasive the doubt."); *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979) ("delay in moving for a preliminary injunction has been considered by some courts in assessing the

probability of irreparable injury. However, delay is only one among several factors to be considered; these cases do not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction."); *Tripathy v. Lockwood*, Civ. No. 22-949, 2022 U.S. App. LEXIS 34929 *6 (2d Cir. 2022) (holding that the district court erred by holding that 29 month "delay in seeking enforcement of his rights was by itself sufficient to deny [plaintiff's] motion for preliminary injunction"). In light of the other factors that support Plaintiffs' claim of irreparable harm, the Court finds that Plaintiffs' brief delay of six weeks was not so lengthy as to shift the balance. The harms Plaintiffs face remain imminent.[15]

Furthermore, given the apparent lack of any arguably lawful basis for the challenged removals, the Court finds that the facts alleged in the Complaint amount to a circumstance that is "genuinely extraordinary" and warrants the issuance of injunctive relief. *See Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (finding that plaintiff failed to establish irreparable injury, yet noting that other cases "may so far depart from the normal situation that irreparable injury might be found"); *Gately v. Massachusetts*, 2 F.3d 1221, 1232 (1st Cir. 1993) (while "temporary loss of income does not rise to the level of irreparable harm in the usual [Title VII] employee discharge case," a discharged employee may still establish irreparable harm under those circumstances if their allegations are "genuinely extraordinary"). For that reason, the Court finds that the "wide latitude traditionally granted the government in dispatching its own internal affairs" is

---

[15]    As previously noted, Defendants also argue that Plaintiffs' claim of irreparable harm is undermined by "the fact they are uncompensated." (**ECF No. 59 at 16**). The Court disagrees: "irreparable harm" consists of a substantial injury that is not accurately measurable or adequately compensable by money damages. *See Ross-Simons of Warwick, Inc.*, 217 F.3d at 13. For that reason, the fact that monetary loss is not among the harms Plaintiffs face is a factor that weighs in favor of their request for injunctive relief, not against it.

simply not decisive in this case. *Gately*, 2 F.3d at 1234. In addition, because Defendants attempted to remove Plaintiffs from the Board without any notice or an opportunity for a hearing, there is no pending "administrative process" that would be disrupted by the issuance of injunctive relief. *Cf. Sampson*, 415 U.S. at 83.

Accordingly, the Court finds that the Plaintiffs have established irreparable harm.

## C.    The Balance of Equities and the Public Interest

The balance of equities and the public interest also weigh in favor of granting preliminary injunctive relief. As the Plaintiffs emphasize, the Oversight Board engages in policy making that has widespread and profound consequences, overseeing the repayment of billions of dollars in debt and directly affecting the lives of millions of Puerto Ricans. (**ECF No. 8 at 20**); (**ECF No. 8-1**); *See Aurelius Inv., LLC*, 590 U.S. at 487 (2020) (Sotomayor, J., concurring) ("The Board has ordered pensions to be reduced by as much as 8.5 percent, a measure that threatens the sole source of income for thousands of Puerto Rico's poor and elderly. Other proposed cuts take aim at already depleted healthcare and educational services. It is under the yoke of such austerity measures that the island's 3.2 million citizens now chafe.") (internal citations omitted). It is, of course, in part for this reason that the work of the Oversight Board is so controversial in Puerto Rico. For a public institution with such vast power, there is a strong public interest in ensuring that the institution operates within the confines of the law; that its members are lawfully appointed; and that the operations of the Oversight Board are not affected by the unilateral and apparently unlawful acts of the President. While this litigation continues, the operations of the Oversight Board hang in the balance: Plaintiffs explain that, since the attempted removals, "uncertainty hangs over the Board's continued operations" in

ways that have directly impacted the resolution of billions of dollars in claims. (**ECF No. 24 at 2**).[16] Under these circumstances, the balance of the equities and the public interest tip in favor of the Plaintiffs' request for emergency relief.

More broadly, there is an obvious public interest in ensuring that the President follows the law. Counsel for Defendants argued at the hearing for a preliminary injunction that this does not constitute a cognizable "public interest." The Court disagrees: the Constitutional powers of all three branches of the federal government emanate from "We the People" and serve to "establish Justice[.]" U.S. CONST. pmbl. The Court considers it "self-evident" that the "People" are disserved by a government that does not follow the law. *See* DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). This principle has been recognized by other courts weighing the "public interest" in the context of a request for preliminary injunctive relief. *See, e.g., Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (concluding that "the public undoubtedly has an interest in seeing its governmental institutions follow the law.") (internal quotations and citations omitted); *Nat'l Treasury Emps. Union v. Vought*, Civ. No. 25-5091, 2025 U.S. App. LEXIS 20863, at *86 (D.C. App. 2025) ("The public interest would be served by preventing Defendants from overstep[ping] their statutory and constitutional authority and usurp[ing] the power of

---

[16]    Specifically, Plaintiffs inform the Court that, "in a status report filed at the end of last month in a Title III proceeding involving more than $3 billion in alleged claim by holders of bonds in the Puerto Rico Electric Power Authority ("PREPA"), the Board requested a "pause" until such a time as the Board has been properly constituted." (**ECF No. 24 at 2**). The status report in question informed the Honorable United States District Judge Laura Taylor Swain that the bondholders in the PREPA Title III proceeding had urged the Oversight Board to request the "pause." (**ECF No. 24-1 at 5 ¶ 8**). Investigative reports covering these events have indicated that the ongoing impasse over the PREPA proceedings has significantly impacted the Oversight Board and its statutory mission. *See, e.g.,* Luis J. Valentín Ortiz, *Post-Mortem on the Fiscal Control Board: "Make Puerto Rico Great Again"*, CENTRO DE PERIODISMO INVESTIGATIVO (Aug. 19, 2025), https://periodismoinvestigativo.com/2025/08/trump-fiscal-control-board-puerto-rico-prepa/ [**https://perma.cc/7ZNY-PMKM**] (last visited Oct. 1, 2025).

the members of Congress.") (internal quotations and citations omitted); *Washington v. FEMA*, Civ. No. 25-12006, 2025 U.S. Dist. LEXIS 150221 at *16 (D. Mass. 2025) ("There is an inherent public interest in ensuring that the government follows the law").

It is not clear what interest Defendants can reasonably invoke to shift the balance. The express "for cause" provision of PROMESA limits the power of the President to remove members of the Oversight Board, so the President has no statutory interest in carrying out his challenged actions. In addition, as the Court has previously explained, the President has no cognizable constitutional interest in exercising this power under the Appointments clause. *See generally Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv.*, LLC, 590 U.S. 448 (2020). Finally, permitting the Executive Branch to engage in such actions unconstrained by law would distort the balance of power between Congress and the President envisioned by the Constitution. U.S. CONST. art. I, § 8, cl. 17; U.S. CONST. art. IV, § 3, cl. 2. Each of these factors weighs in favor of the issuance of injunctive relief.

Accordingly, the Court concludes that the balance of equities and the public interest weigh in favor of issuing immediate injunctive relief.

## III.    Remedies

Having established their entitlement to preliminary injunctive relief, Plaintiffs move the Court to issue an order enjoining Defendants Gor, Nixon, and Mujica from taking any actions to effectuate the attempted removal of Plaintiffs from the Oversight Board. (**ECF No. 8-12 at 2**). In opposition, Defendants argue broadly that, based on "traditional principles of equity jurisprudence," Plaintiffs are not "entitled to an injunction." (**ECF No. 59 at 3, 12**). Their argument has two components.

First, Defendants argue that "reinstatement" to public office is not a "traditional equitable remedy" and is therefore not available to redress the injuries to Plaintiffs. (**ECF**

**No. 59 at 13**). That is a questionable proposition of law. *See Wilcox v. Trump*, 775 F. Supp. 3d 215, 237 n.22 (D.D.C. 2025) (collecting cases). However, the Court need not order "reinstatement" because Plaintiffs have never been properly removed from office. After all, "[t]he President may remove any member of the Oversight Board *only* for cause." 48 U.S.C. § 2121(e)(5)(B) (emphasis added). As the Court has explained, Plaintiffs were never lawfully removed from office, as they were not removed "for cause." The Court therefore need not order "reinstatement" to fashion appropriate relief.

Second, Defendants argue broadly that "the Court lacks jurisdiction to enter an injunction or *any other remedy* against the President of the United States." (**ECF No. 59 at 12**) (emphasis added).[17] Despite the sweeping nature of their claim, Defendants provide no direct support for the idea that the federal courts are incapable of fashioning *any* remedy against the President. The cases on which Defendants rely do not stand for the rule of law they assert. *See Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) ("We have left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty"); *Mississippi v. Johnson*, 71 U.S. 475 (1867) (distinguishing between "a purely ministerial act under positive law" and "the exercise of Executive discretion" and holding that, as to the latter, an Article III court may not issue an injunction directly against the President); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Franklin v. Massachusetts* and *Mississippi v. Johnson* and stating in dicta that injunctive relief is not available against the President). There appear to be at least certain narrow circumstances under which a federal court may issue coercive relief directly against the President. *See United States v. Nixon*, 418 U.S. 683

---

[17]    To be clear, Plaintiffs do not request that the Court enter injunctive relief directly against the President of the United States. *See* (**ECF No. 8-12 at 2**).

(1974) (holding that the President may be subject to a subpoena to provide information relevant to an ongoing criminal prosecution). Moreover, this is not a case where the President "acts pursuant to the powers invested exclusively in him by the Constitution." *Trump v. United States*, 603 U.S. 593, 607 (2024) (citing *Marbury v. Madison*, 5 U.S. 137 (1803)); *see Aurelius Inv., LLC*, 590 U.S. at 465–467. It is therefore not certain whether a federal court may or may not directly enjoin the President of the United States.

Seizing on this ambiguity in the law, Defendants appear to go much further than arguing simply that the Court may not directly enjoin the President. Despite claiming broadly that Plaintiffs are not "entitled to an injunction," Defendants never address whether the Court may issue injunctive relief against the President's subordinates in a way that restricts the President's power to remove members of the Oversight Board under Section 2121(e)(5)(B). *See* (**ECF No. 59 at 3, 12**). Coupled with Defendants other arguments that Presidential removals under Section 2121(e)(5)(B) are not subject to judicial review, (**ECF No. 59 at 8**), Defendants seem to imply that, where the President acts outside of the law, there is no way for an Article III court to review his unlawful acts. Carried to its logical conclusion, this disturbing argument would raise grave separation of powers concerns. For that same reason, it is also contrary to the law: although a federal court may not have the power to issue injunctive relief directly against the President, that does not "in any way suggest[] that Presidential action is *unreviewable*. Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive[.]" *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, (1952)). Defendants make no attempt to distinguish these cases. Defendants thus fail to support their much broader claim that Plaintiffs "cannot obtain an injunction" that

would remedy the harms they face. Defendants Gor, Nixon, and Mujica are each directly subject to the Court's equitable jurisdiction. Accordingly, the Court need not reach the issue of whether the President is directly subject to the equitable powers of the Court.[18]

Since Plaintiffs were never properly removed from office, the Motion for a Preliminary Injunction is **GRANTED**. It is further **ORDERED** that Defendants Sergio Gor, John E. Nixon, and Robert F. Mujica, as well as their "officers, agents, servants, employees, and attorneys", FED. R. CIV. P. 65(d)(2), are preliminarily **ENJOINED** from effectuating in any manner the attempted removal of Plaintiffs from their positions as a members of the Financial Oversight and Management Board for Puerto Rico, including by treating them as having been removed and denying or obstructing them access to any of the rights, responsibilities, benefits or resources of their office, placing a replacement in Plaintiffs' positions, or otherwise recognizing any other person as a member of the Financial Oversight and Management Board for Puerto Rico in their place, pending the resolution of this litigation.

## IV.    Conclusion

The rule of law is the cornerstone of our Constitution, our democracy, and our collective belief in justice and accountability. At a minimum, this ideal promises that our system is "a government of laws and not of men." *Cooper v. Aaron*, 358 U. S. 1, 23 (1958) (Frankfurter, J., concurring) (quoting *Wisconsin v. Illinois*, 281 U.S. 179, 197 (1930)); *United States v. United Mine Workers*, 330 U.S. 258, 312 (1947) (Frankfurter, J., concurring) ("There can be no free society without law administered through an

---

[18]    Since the Court issues the preliminary injunctive relief Plaintiffs seek, the Court declines to address Plaintiffs' request for a writ of mandamus. (**ECF No. 1 at 15**).

independent judiciary. If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny.").

"[E]veryone, from the President on down, is bound by law." *Trump v. CASA*, *Inc.*, 606 U.S. 831, 923 (2025) (Jackson, J., dissenting); *see also United States v. Lee*, 106 U. S. 196, 220 (1882) ("No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."). The President took an oath not to rule, but to *faithfully* defend and protect the Constitution. That oath is a solemn promise to the people. The Constitution envisions a federal government of limited power, a government in which even the President is constrained by the law. The President must set the highest standard, not only by enforcing the law, but by living under it. When the President disregards the law, the very foundations of our democracy begin to crack. A strong democracy relies on constant vigilance to ensure that leaders follow the rules that they are sworn to uphold.

In this case, the President attempted to remove Plaintiffs from the Oversight Board without even attempting to articulate a "cause" for the attempted removals. That action was plainly contrary to law. Under the governing statute, the President has the authority to remove Board Members from their positions "*only* for cause." 48 U.S.C. § 2121(e)(5)(B) (emphasis added). That entails not only notice of the reasons for removal, but also an opportunity to contest the grounds for removal. The record does not reflect any efforts by administration officials to conform their conduct to the clear requirements of Section 2121(e)(5)(B) or to the due process protections guaranteed by the Fifth Amendment of our Constitution. Moreover, in this litigation Defendants have advanced arguments that both lack support in the law and run afoul of basic rule of law principles. Under the

circumstances presented by this case, it is "emphatically the province and duty" of this Court to act. *See Marbury*, 5 U.S. at 178 (refusing to "declare that an act, which, according to the principles and theory of our government, is entirely void; is yet, in practice, completely obligatory").

The Court has tremendous respect for the Office of the President. Moreover, PROMESA itself vests the President with significant authority by providing him the power to remove a Board Member. 48 U.S.C. § 2121(e)(5)(B). That statutory provision, however, also limits his discretion: removals that are not "for cause" are not lawful under the Act. Under the circumstances presented by this case, the careful balance of powers prescribed by the Constitution requires the Court to grant Plaintiffs' request for emergency injunctive relief. Upon careful review of all relevant factors, the Court finds that the Plaintiffs have demonstrated (1) that they are likely to succeed on the merits, (2) that they will suffer irreparable harm absent a temporary restraining order, and (3) the balance of equities and the public interest weigh in favor of issuing a temporary restraining order.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 3rd day of October, 2025.

*/s/ María Antongiorgi-Jordán*
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**